GEORGE W. GINO AND EMILIE GINO, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1676–71. Filed May 31, 1973.

*Martin N. Segal,* for the petitioners.
*Stephen W. Simpson,* for the respondent.

FINDINGS OF FACT AND OPINION

HALL, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Deficiency |
|---|---|
| 1966 | $1,446.50 |
| 1967 | 652.56 |
| 1968 | 484.68 |
| Total | 2,583.74 |

The issues for decision are the following:[1]

(1) Are petitioners entitled to deduct as an educational expense all or any part of the cost of their around-the-world trip taken in the summer of 1966?

(2) What is the amount of the deduction to which petitioners are entitled in 1966, 1967, and 1968 for business use of their home?

(3) Are petitioners entitled to a deduction for nonreimbursed educational and miscellaneous expenses in excess of the amounts allowed in the notices of deficiency for 1966, 1967, and 1968?

## GENERAL FACTS

Some of the facts have been stipulated and are found accordingly.

Petitioners, husband and wife, resided in Marina del Rey, Calif., when they filed their petition herein. They timely filed their joint Federal income tax returns for the years 1966, 1967, and 1968 with the district director of internal revenue at Los Angeles, Calif.

## 1. *Around-the-World Trip*

### FINDINGS OF FACT

During the years in issue, petitioners were high school teachers employed by the Los Angeles City school system. Both held general teaching credentials and each had about 10 years of teaching experience.

During 1966, 1967, and 1968 petitioner George Gino (George) taught driver education and training at Granada Hills High School. The driver education course, as taught by George, consisted of six major units and lasted about 10 weeks. The course was broken down as follows:

| Subject matter | Length of time spent | Subject matter | Length of time spent |
|---|---|---|---|
| Introduction | 1½ weeks | Alcohol and drugs | 1 week |
| Psychology of the driver | 2 weeks | Natural laws | 1 week |
| Eyes of the driver | 1 week | Vehicle code | 3½ weeks |

---

[1] The parties now agree that petitioners are entitled to a $1,500 deduction for summer study in Maine during 1967 and rental losses of $130 and $2,452 for 1967 and 1968, respectively. In addition, respondent now concedes that petitioners are entitled to some office-in-home expenses, but in lesser amounts than deducted on their returns for 1966, 1967, and 1968.

During the introduction, George emphasized the economic importance of the car in our society. Attitude of the driver toward various traffic conditions confronting him was emphasized in "psychology of the driver." "Eyes of the driver" was devoted to the anatomy of the eye, and the student was made aware of eye-related physiological phenomena experienced while driving. The effects of drugs and alcohol on driving were taught in that portion of the course so named. The roles of gravity, friction, centrifugal force, inertia, and force of impact were explained and discussed during the "natural law" segment of the course. The final unit of the course was a study of the California Vehicle Code.

George has long had a strong interest in traffic engineering and also the development of alternatives to the automobile as a means of transportation.

During 1966, 1967, and 1968 petitioner Emilie Gino (Emilie) taught physics, modern science, and biology at Washington and Venice High Schools. The science courses taught by Emilie were the basic high school courses offered by the Los Angeles City school system to 11th and 12th grade students.

The physics course consisted of the study of matter, measurement, mechanics of liquids, mechanics of gases, force, motion, machines, heat, electricity, sound, light, spectroscopy, radio, electronics, atomic energy, and cosmic rays. The modern science course covered applied chemistry, modern materials, man and machines, heat and fuels, nuclear energy, sound, light, electricity, electronics, and space. The biology course was devoted to the study of plants and animals.

During the summer of 1966 petitioners took a 72-day trip around the world. The itinerary of their trip took them to:

| Place | Date | Place | Date |
|---|---|---|---|
| Honolulu | 6/22—6/23 | Zurich—W. Berlin | 7/30—7/31 |
| Honolulu—Tokyo | 6/24—6/25 | W. Berlin—E. Berlin | 8/1—8/2 |
| Tokyo | 6/26—6/27 | Moscow—Leningrad | 8/3—8/4 |
| Tokyo—Osaka | 6/28—6/29 | Helsinki | 8/5—8/6 |
| Hong Kong | 6/30—7/5 | Stockholm | 8/7—8/8 |
| Bangkok | 7/6—7/7 | Stockholm—Smedstva, Norway | 8/9—8/10 |
| New Delhi | 7/8—7/9 | | |
| Kathmandu, Nepal | 7/10—7/11 | Trondheim—Oslo | 8/11—8/12 |
| New Dehli—Cairo | 7/12—7/13 | Copenhagen | 8/13—8/14 |
| Jerusalem | 7/14—7/15 | Copenhagen—Rotterdam | 8/15—8/16 |
| Beirut | 7/16—7/17 | Rotterdam—Amsterdam | 8/17—8/18 |
| Athens | 7/18—7/19 | Amsterdam—Brussels | 8/19—8/20 |
| Belgrade | 7/20—7/21 | Brussels | 8/21—8/22 |
| Rome | 7/22—7/25 | Luxembourg—Paris | 8/23—8/24 |
| Zurich | 7/26—7/27 | Paris | 8/25—8/26 |
| Chamonix, France—Switzerland | 7/28—7/29 | London | 8/27—8/30 |
| | | London—Boston | 8/31—9/1 |

Prior to the trip, George had not attempted to correspond with any foreign motor vehicle authorities or to arrange any appointments with foreign officials. George did not attempt to secure information from local consulates of the various countries visited in order to secure assistance in determining the location and identity of the responsible foreign officials. He was able to locate the motor vehicle regulatory agency in 8 of the 24 countries he visited.

During the trip, petitioners visited a school in Japan that was in session, another in Thailand that was also in session, and one in Norway that was not in session. Petitioners toured the American University of Beirut, Lebanon. They did not visit any other major European universities, nor did they attend lectures or seminars relating to the courses they taught. The only lectures they heard were those any tourist would hear if he visited the particular facility then being visited by petitioners.

Petitioners kept a diary, took movies, and obtained written materials. The movies and written materials were used in their classrooms.

The Los Angeles City school system has an "in-service education program" granting teachers an opportunity to obtain salary point credits for approved travel. The maximum salary points allowed for approved summer travel is 6 points. One point is the equivalent of 1 semester of college credit. Upon acquiring 14 points a teacher moves into a higher salary grade. In addition, teachers get in-grade raises for each year of teaching experience. The board of education does not require personnel to engage in approved travel in order to retain salary, status, or employment. As a result of their around-the-world trip, each petitioner received 6 salary points from the board of education.

On their 1966 tax return, petitioners claimed a $5,500 deduction for employee business expenses arising from the around-the-world trip as follows:

| | |
|---|---:|
| Transportation expenses | $3,500 |
| Meals and lodging | 2,000 |
| Other | 500 |
| Minus $500 for pleasure | (500) |
| Total travel expenses | 5,500 |

Petitioners claimed an additional $975 during trial as expenses related to their 1966 trip. This additional amount is an estimate and petitioners presented no details or independent proof of these expenses.

OPINION

Petitioners contend that their 72-day around-the-world trip taken in the summer of 1966 was undertaken by them primarily to maintain and improve their job skills and was directly related to their

trade or business. Sec. 162(a) ;[2] sec. 1.162–5, Income Tax Regs. Respondent asserts that the trip was a personal expense and therefore not deductible. Sec. 262.

For 72 days in the summer of 1966 petitioners journeyed around the world visiting Hawaii, Japan, Hong Kong, Thailand, India, Nepal, Egypt, Jordan, Lebanon, Greece, Yugoslavia, Italy, Switzerland, both East and West Germany, Russia, Finland, Sweden, Norway, Denmark, the Netherlands, Belgium, France, and England. Petitioners' travel expenses incurred on their around-the-world trip are deductible under section 162(a) only if they constitute ordinary and necessary business expenses. Section 1.162–5, Income Tax Regs., governing the deductibility of a taxpayer's educational expenses, which was in force during 1966 and 1967 was promulgated in 1958 by T. D. 6291.[3] In 1967 revised regulations section 1.162–5 was promulgated by T. D. 6918.[4] These new regulations are effective for taxable years

---

[2] All Code references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

[3] T.D. 6291 (Apr. 5, 1958) provides in part as follows :

Sec. 1.162–5  Expenses for education.

(a) Expenditures made by a taxpayer for his education are deductible if they are for education (including research activities) undertaken primarily for the purpose of :

(1) Maintaining or improving skills required by the taxpayer in his employment or other trade or business, or

(2) Meeting the express requirements of a taxpayer's employer, or the requirements of applicable law or regulations, imposed as a condition to the retention by the taxpayer of his salary, status or employment.

Whether or not education is of the type referred to in subparagraph (1) of this paragraph shall be determined upon the basis of all the facts of each case. * * *

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

(c) In general, a taxpayer's expenditures for travel (including travel while on sabbatical leave) as a form of education shall be considered as primarily personal in nature and therefore not deductible.

(d) If a taxpayer travels away from home primarily to obtain education the expenses of which are deductible under this section, his expenditures for travel, meals, and lodging while away from home are deductible. However, if as an incident of such trip the taxpayer engages in some personal activity such as sightseeing, social visiting or entertaining, or other recreation, the portion of the expenses attributable to such personal activity constitutes nondeductible personal or living expenses and is not allowable as a deduction. If the taxpayer's travel away from home is primarily personal, the taxpayer's expenditures for travel, meals and lodging (other than meals and lodging during the time spent in participating in deductible educational pursuits) are not deductible. Whether a particular trip is primarily personal or primarily to obtain education the expenses of which are deductible under this section depends upon all the facts and circumstances of each case. An important factor to be taken into consideration in making the determination is the relative amount of time devoted to personal activity as compared with the time devoted to educational pursuits. Expenses in the nature of commuters' fares are not deductible.

[4] T.D. 6918 (May 1, 1967) provides in part as follows :

Sec. 1.162–5  Expenses for education.

(a) *General rule.*—Expenditures made by an individual for education * * * are deductible as ordinary and necessary business expenses (even though the education may lead to a degree) if the education—

(1) Maintains or improves skills required by the individual in his employment or other trade or business, or

(2) Meets the express requirements of the individual's employer, or the requirements of applicable law or regulations, imposed as a condition to the retention by the individual

beginning on or after January 1, 1968, but for prior years taxpayers may rely on either the 1958 or the 1967 regulations. Rev. Rul. 68–191, 1968–1 C.B. 67.

For petitioners to satisfy the requirements of the 1958 regulations, they must establish both that the primary purpose of their travel was to maintain or improve required skills and that their travel was of such a nature as to maintain or improve skills. The 1967 regulations remove the subjective requirement of primary purpose and therefore are more favorable to petitioners. If petitioners fail to satisfy the test for deductibility under the new regulations, *a fortiori*, they fail under the old regulations. Accordingly, in fairness to petitioners, we apply the new regulations in this case. *Stanley Marlin*, 54 T.C. 560, 563–565 (1970).

Under the 1967 regulations, deductibility of petitioners' travel expenses turns on the factual question whether a major portion of the activities in which they engaged during their around-the-world trip was of such a nature as directly to maintain or improve skills required by each of them in their employment. Sec. 1.162–5, Income Tax Regs. (1967).

We find that both petitioners' activities on this trip were not materially different from those reasonably expected of any other tourists their age on a sightseeing trip abroad. *Dennehy v. Commissioner*, 309 F. 2d 149 (C.A. 6, 1962), affirming a Memorandum Opinion of this Court. They visited volcanoes in Hawaii, the Imperial Gardens in Tokoya, the Taj Mahal in India, the Acropolis in Athens, the Vatican in Rome, the Van Hoppes diamond factory in Amsterdam, the Eiffel Tower in Paris, and Westminster Abbey in London. Petitioners also engaged in general sightseeing in Tokyo, Rome, East Berlin, Copenhagen, Moscow, Norway, and Paris.

During the trip George Gino, a driver education teacher in the Los Angeles City school system, observed world traffic problems and made inquiries about the vehicle codes and licensing requirements of

---

of an established employment relationship, status, or rate of compensation.

\* \* \* \* \* \* \*

(d) *Travel as a form of education.*—Subject to the provisions of paragraph (b) and (e) of this section, expenditures for travel (including travel while on sabbatical leave) as a form of education are deductible only to the extent such expenditures are attributable to a period of travel that is directly related to the duties of the individual in his employment or other trade or business. For this purpose, a period of travel shall be considered directly related to the duties of an individual in his employment or other trade or business only if the major portion of the activities during such period is of a nature which directly maintains or improves skills required by the individual in such employment or other trade or business. The approval of a travel program by an employer or the fact that travel is accepted by an employer in the fulfillment of its requirements for retention of rate of compensation, status or employment, is not determinative that the required relationship exists between the travel involved and the duties of the individual in his particular position.

some of the foreign countries he visited. He testified he had a keen interest in traffic engineering and solutions to traffic congestion. In this connection, he took a ride on the high-speed train between Tokyo and Osaka and drove through the Mont Blanc Tunnel. George further testified he has shown his classes movies taken on this trip, and that he has been able to better motivate his students' interest in driver education by relating his travel experiences to them.

The primary skill required by George in his employment as a teacher of driver education in Granada Hills High School is the ability to teach his students the California Vehicle Code, the natural forces affecting the operation of a car, the enervating effects of drugs and alcohol upon a driver, and the development of a defensive attitude toward driving. That he was able to enliven his course through discussions of world traffic problems and the vehicle codes and licensing requirements of various foreign countries at best is only incidental to educating and training new California drivers. We find that George's activities on this trip did not directly maintain and improve skills required of him as a driver education teacher within the purview of the regulations.

George's wife Emilie, a science teacher in the Los Angeles City school system, visited one high school physics class in Tokyo and one high school science class in Bangkok on this trip. She also visited the Atomium in Brussels, but there she heard only those lectures heard by visiting tourists. She testified that she observed the scientific ramifications of a chance typhoon in Tokyo, land reclamation in Hong Kong, the salinity of the Dead Sea in Jerusalem, the weathering of the Acropolis in Athens, farm conditions in Yugoslavia, and the Eiffel Tower in Paris. Emile further testified that she tells her students about things she observed on this trip and, in addition, has shown her students movies taken during the course of the trip. She also testified that she has experienced increased rapport with her foreign-born students as a result of her travel experiences.

The primary skill required by Emilie in her employment as a high school science teacher is the ability to teach a tremendous volume of basic scientific material in the areas of physics, modern science, and biology. Emilie visited only one physics class and one other science class during the entire trip. She did not visit the science faculties of any universities, nor did she attend any lectures given by any biologists, chemists, or physicists.

As in George's case, we find that Emilie's activities on this trip did not directly maintain and improve skills required of her as a science teacher within the purview of the regulations. Emilie's increased rapport with her foreign-born students is not a sufficient reason to sustain

the business nature of the trip. *Fugate* v. *United States*, 259 F. Supp. 398 (W.D. Tex. 1966).

Furthermore, the trip was not required by petitioners' employer, the Los Angeles Board of Education, in order for petitioners to retain their salary, status, or employment. Petitioners' receipt of salary point credits from the board is not decisive. The regulations state that "approval of a travel program by an employer or the fact that travel is accepted by an employer in the fulfillment of its requirements for retention of rate of compensation, status or employment, is not determinative that the required relationship exists between the travel involved and the duties of the individual in his particular position." Sec. 1.162–5(d), Income Tax Regs. (1967).

Finally, during the trial, petitioners claimed additional travel expenses beyond those set forth in their 1966 Federal income tax return. These expenses were totally unsubstantiated and based only on estimates. Even if their trip had been a business trip, and we have held it was not, petitioners have failed to meet the substantiation requirements of section 274(d).

## 2. *Office-in-Home Expense*

### FINDINGS OF FACT

During 1966, 1967, and 1968, both petitioners performed non-classroom duties at home in connection with their employment. Petitioners each spent approximately 2 hours a night, 5 days a week, on preparation of lesson plans, preparing and grading of examinations, and reading of professional materials. In addition, part of their home was used for the storage of their professional library, consisting of over 200 books, and other teaching materials.

From January 1966 through October 1967, petitioners lived in an apartment which they rented for $185 per month. This apartment consisted of a bedroom, living room, and kitchen. Petitioners used 20 percent of the space of this apartment (including the dining room table in the living room and the kitchen table) in connection with their teaching activities. Utilities, exclusive of telephone, were $20 per month throughout this period.

From November 1967 through May 1968, petitioners lived in a condominium which they rented for $300 per month. This condominium consisted of a bedroom, living room, dining area, kitchen, and den. Petitioners used 25 percent of the space of this condominium in connection with their teaching activities. Utilities, exclusive of telephone, were $25 per month for this period.

From June 1968 through December 1968, petitioners lived in a con-

dominium which they purchased. This condominium consisted of two bedrooms, a living room, dining area, kitchen and den. Petitioners used 33⅓ percent of the space of this condominium in connection with their teaching activities.

On their 1966, 1967, and 1968 returns, petitioners claimed $500, $630, and $1,000, respectively, as office-in-home expenses. Respondent initially disallowed the entire deduction. However, in his brief respondent allowed part of the office-in-home deductions claimed by petitioners, and disallowed the remainder as excessive.

Respondent computed the allowed deduction for each year as follows:

*1966*

| | | |
|---|---:|---:|
| Utilities (12 months @ $20/month) | $240.00 | |
| Rent (12 months @ $185/month) | 2,220.00 | |
| Total | 2,460.00 | |
| Expenses attributable to 20 percent space use (20 percent of $2,460) | 492.00 | |
| Expenses attributable to business use of space (2/24[1] of $492) | | $41.00 |

*1967*

| | | |
|---|---:|---:|
| January through October: | | |
| Utilities (10 months @ $20/month) | 200.00 | |
| Rent (10 months @ $185/month) | 1,850.00 | |
| Total | 2,050.00 | |
| Expenses attributable to 20 percent space use (20 percent of $2,050) | 410.00 | |
| Expenses attributable to business use of space (2/24 of $410) | | 34.17 |
| November and December: | | |
| Utilities (2 months @ $25/month) | 50.00 | |
| Rent (2 months @ $300/month) | 600.00 | |
| Total | 650.00 | |
| Expenses attributable to 25 percent space use (25 percent of $650) | 162.50 | |
| Expenses attributable to business use of space (2/24 of $162.50) | | 13.54 |
| Total | | 47.71 |

[1] The "2" in "2/24" represents the number of hours per day that petitioners used their home for business purposes.

*1968*

January through May:

| | | |
|---|---|---|
| Utilities (5 months @ $25/month) | $125.00 | |
| Rent (5 months @ $300/month) | 1,500.00 | |
| | | |
| Total | 1,625.00 | |
| | | |
| Expenses attributable to 25 percent space use (25 percent of $1,625) | 406.25 | |
| Expenses attributable to business use of space (2/24 of $406.25) | | $33.85 |

June through December:

| | | |
|---|---|---|
| Utilities (7 months @ $25/month)[2] | 175.00 | |
| Rent and/or depreciation [3] | 0 | |
| | | |
| Total | 175.00 | |
| Expenses attributable to 33⅓ space use (33⅓ percent of $175) | 58.33 | |
| Expenses attributable to business use of space (2/24 of $58.33) | | 4.86 |
| | | |
| Total | | 38.71 |

[2] The record is silent with respect to the cost of utilities for this period. Respondent allowed $25 per month for utilities from January through May.

[3] The record is devoid of any evidence which could be used to establish a basis for determining a depreciation rate.

### OPINION

Both parties agree that petitioners are entitled to a deduction for business use of their home pursuant to section 162(a). The parties have stipulated the percentages of the space of petitioners' various residences that was used for their teaching activities. However, the amount that petitioners are entitled to deduct for this expense remains to be decided. Petitioners contend that they are entitled to deduct $500, $630, and $1,000 for 1966, 1967, and 1968, respectively. Respondent, on the other hand, contends that petitioners are entitled to deduct only $41, $47.71, and $38.71 for 1966, 1967, and 1968, respectively.

Petitioners have the burden of proving the amount of the expenses incurred for maintaining their residences and the portion thereof that is properly allocable to business use. Rule 32, Tax Court Rules of Practice. The parties stipulated the amount of the expenses incurred in connection with the rented apartment and the rented condominium, as well as the percentage of the total area of each residence used for business purposes. However, there is no evidence in the rec-

ord with respect to either the cost of utilities at the purchased condominium or the cost or useful life of the depreciable portion of that residence. The respondent in his brief allowed $25 per month for utilities at the purchased condominium, and under *Cohan* we agree with that amount. *Cohan v. Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). However, no depreciation is allowable on account of the purchased condominium because there is no evidence in the record on which to make a determination or even an estimate of allowable depreciation.

Petitioners must prove not only what part of the residence was used for business purposes, but also the portion of time it was so used. This Court, in *International Artists, Ltd.*, 55 T.C. 94, 107 (1970), acq. 1971–2 C.B. 3, was called upon to allocate the depreciation and maintenance expenses of a large house between business and personal use. Taxpayer, entertainer Liberace, lived in the house and also conducted some of his business on the premises. In addition, the house stood empty for long periods of time during which Liberace was away from Los Angeles. Respondent there contended that 1/6 of the house was used 20 percent of the time for business purposes. Respondent, apparently relying on Rev. Rul. 62–180, 1962–2 C.B. 52, arrived at the 20-percent figure by the method presented in that ruling, i.e., comparing the days of business use of the premises with the total number of days available for both business and personal use. The Court found instead that the relevant period in determining the comparative business and personal use of the house was the total period of actual use of the premises while Liberace was present in Los Angeles. Likewise, in section 1.274–2(e)(4), Income Tax Regs., in determining whether the primary use of certain transportation facilities (such as an automobile or airplane) or entertainment facilities (such as a yacht, hunting lodge, vacation cottage, country club, etc.) is for business or personal purposes, "it is the *actual use* of the facility which establishes the deductibility of expenditures with respect to the facility; not its *availability for use*." (Emphasis added.)

In this case we hold that the proper ratio to apply is the ratio of hours of business use to hours of total use of the rooms in issue in petitioners' apartment or condominium. Respondent's contention notwithstanding, we do not apply the ratio of hours of business use to hours in the day. We disagree with the following portion of respondent's Rev. Rul. 62–180, 1962–2 C.B. 52, 54: "Where a portion of the residence is regularly used for business purposes only part of the time, a further allocation must be made on the basis of the ratio of the time the area is actually used for business purposes to the *total time it is*

*available for all uses.*" (Emphasis added.)[5] The obvious difficulty with an allocation of business use as a percentage of total hours of availability for use rather than total hours of use, is the erroneous and distorting assumption that a dual-use facility is not, when unused, just as much available for business as it is for nonbusiness use. The correct rule is to prorate in proportion to actual use, in the manner specified in regulations section 1.274–2(e)(4), without the thumb on the scales provided by the allocation to personal use of all hours of nonuse.

Petitioners have testified that the living room and kitchen in the apartment, and presumably the living room, dining room, and den in the condominiums were regularly used for their teaching activities. However these areas were also regularly used for nonteaching activities. Petitioner George Gino estimated, and we have found that he and his wife together used the residence "a couple of hours a night" for teaching-related activities. The record shows that both petitioners held full-time teaching jobs, and presumably they were away from home at least 8 hours a day on working days during which time the residence was not used for either business or personal reasons. Presumably petitioners occupied the bedrooms for another approximately 8 hours at night. It would seem therefore that the "work areas" were actually in use not more than some 8 hours a day. Therefore, even under the *Cohan* rule, a more reasonable fraction to apply is 2/8 rather than the 2/24 employed by the respondent. Based on all the facts and circumstances, taking into account weekends, holidays, and vacations on which the testimony was imprecise on the one hand, and the use of part of the apartment and condominiums for permanent storage of work-connected materials on the other, we hold that 25 percent of the housing costs allocable to the work-at-home areas is deductible. We recognize that allocations of this type are necessarily imprecise, but they are required if justice is to be served. *Cohan* v. *Commissioner*, *supra*.

### 3. *Miscellaneous and Educational Expenses*

#### FINDINGS OF FACT

In their 1966, 1967, and 1968 returns, petitioners claimed as educational and miscellaneous expenses the amounts of $200, $400, and $600,

---

[5] This Court's reliance on Rev. Rul. 62–180 in the unreported decision, *Martha Henderson*, T.C. Memo. 1968–22, is not inconsistent herewith since in *Henderson* the taxpayer, who worked at home, spent substantially all her time, for all that appeared in the record, in the one-room "efficiency" apartment where she lived. Under such circumstances the apartment was in use, either for business or personal purposes, substantially all the time, and the Rev. Rul. 62–180 allocation method reaches the same result as the method we have herein applied. We do not agree with the unreported case of *Horatio C. Hoggard III* v. *United States* (E.D. Va. 1967, 20 A.F.T.R. 2d 5805, 67–2 U.S.T.C. par. 9741) to the extent it applies the above-quoted portion of Rev. Rul. 62–180.

respectively. Respondent allowed $119, $128, and $117 for those years, respectively, and disallowed the remainder for lack of substantiation. These disallowed amounts consisted of an adding machine, a movie projector, and incidental expenditures for paper, pens, folders, and stencils.

OPINION

Petitioners claim they are entitled to deduct for miscellaneous and educational expenses the amounts of $200, $400, and $600 for 1966, 1967, and 1968, respectively. Respondent contends they are entitled to deduct only $119, $128, and $117 for those years, respectively, on the grounds petitioners have failed to substantiate any greater amounts.

Petitioners have offered no evidentiary substantiation, beyond their estimates, for any amounts in excess of the amounts allowed in each year by respondent. Petitioners did not maintain a written record of purchases of work-related materials. In either 1967 or 1968, petitioners could not remember which year, a projector and an adding machine were acquired. George thought the projector cost $130 and Emilie thought it cost $175. The useful life of neither the projector nor the adding machine was established. The parties testified that both machines were used approximately 50 percent of the time in connection with their teaching activities.

In view of petitioners' vague and inconsistent testimony, which would for the most part tend to establish a capital expenditure rather than a business expense, we hold that petitioners have not met their burden of proof in establishing that any of these additional amounts, in addition to the amounts allowed by respondent, is allowable as a business expense for any of the years in issue.

*Decision will be entered under Rule 50.*