JAMES RONALD CARNEY and ANNE CAMERON CARNEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carney v. Commissioner
Docket No. 10548-75.
United States Tax Court
T.C. Memo 1978-71; 1978 Tax Ct. Memo LEXIS 444; 37 T.C.M. (CCH) 349; T.C.M. (RIA) 780071; February 23, 1978, Filed *444 H, a camouflage engineer, and W spent 38 days visiting 8 European countries. Held, the major portion of such trip did not directly maintain or improve skills required in H's employment, and therefore, his portion of the expenses is not deductible. James Ronald Carney, pro se. Harris J. Belinkie and Thomas C. Morrison, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $408.29 in the petitioners' Federal income tax for 1972. The only issue for decision is whether certain expenses incurred on a European trip are deductible educational traveling expenses under section 162(a) of the Internal Revenue Code of 1954. [1]
*445 FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, James Ronald Carney and Anne Cameron Carney, husband and wife, maintained their legal residence in Alexandria, Va., at the time they timely filed their petition in this case. They filed their joint Federal income tax return for 1972 with the District Director of Internal Revenue, Richmond, Va. Sometime prior to 1970, Mr. Carney graduated from the University of Arkansas, where he majored in civil engineering and received a bachelor of science degree. From 1970 to 1975, he was employed by the Department of the Army as a civil engineer and was assigned to the U.S. Army Mobility Equipment Research and Development Center, Countersurveillance and Topographic Division (MERDC), located at Fort Belvoir, Va. During this period, Mr. Carney worked as an engineer on many defense projects such as the lightweight netting contract (a worldwide camouflage system) and the Hawk missile camouflage program. From July 1970 to July 1972, Mr. Carney spent approximately 50 percent of his working time on NATO projects, which dealt with a wide variety of defense matters including the following: *446 (1) The Military Agency for Standardization (Camouflage and Concealment Working Party), the goal of which was to consider the subjects of camouflage and concealment in terms of standardization, interchangeability, or interoperability of related equipment and operating procedures of NATO armed forces; (2) the Joint Field Trials on Air Defense Site Camouflage, the goal of which was to examine ways to reduce the vulnerability of air defense sites through application of appropriate camouflage measures; (3) Research Sub Group I, Concealment and Deception, the goal of which was to study concealment and deception as a means of increasing the survivability of air defense systems; (4) Working Group A of Research Sub Group I, the goal of which was to investigate visible and radar properties of targets and backgrounds and to investigate methods of specifying backgrounds other than reflectivity, emissivity, and cross section; and (5) Working Group D of Research Sub Group I, the goal of which was to develop concealment and deception hardware. In connection with his work at MERDC, Mr. Carney had to acquire a broad knowledge of many disciplines, including management, the engineering sciences, *447 physics, optics, colorimetry, acoustics, and fields related to modern camouflage techniques, countersurveillance, and sensor technology. In addition, under certain circumstances, a knowledge of European geography was beneficial with respect to the camouflage portion of these NATO projects. There were four primary methods of accomplishing the basic camouflage objective of concealing a target: (1) Hiding the target; (2) disguising the target; (3) creating a decoy which draws attention away from the target; and (4) blending the target with the area immediately surrounding the target. Only in the case of blending was a knowledge of geography important. Mrs. Carney was an elementary school teacher, and early in 1972, Mr. and Mrs. Carney decided to visit and observe a number of the European countries. Accordingly, they made inquiries at several travel agencies, and after considering the financial and educational aspects of various tours, they decided that a tour sponsored by the National Education Association (NEA), a national teachers organization, and conducted in cooperation with East Carolina University, was best suited to their needs. However, before making any definite commitments, *448 Mr. Carney had to be sure he could get the necessary time off from work. Upon receiving permission from his supervisor at MERDC to take his annual leave during July and August of 1972, the petitioners signed up for the NEA tour titled Europe for the Young at Heart and paid their deposit. The tour director was a professor of geography at East Carolina University. Members of the tour could receive up to 6 hours of academic credit if they registered for one of three courses offered in conjunction with the tour, paid the tuition and related fees, and wrote a required term paper. Mrs. Carney elected to receive credit, registered in one of the courses, and fulfilled the necessary requirements. Mr. Carney, on the other hand, decided that there was no point in paying the tuition and related fees because he did not need, and he could not subsequently use, the academic credit. Accordingly, Mr. Carney did not register in any of the courses nor did he satisfy the requirements, such as writing a term paper. However, by way of preparation for the tour, Mr. Carney reviewed a 1945 camouflage evaluation report which discussed some of the camouflage problems in Europe during World War II. He *449 also wrote a short paper on the general geographical characteristics of Europe, and the petitioners sent away for some of the materials on the suggested reading list for Mrs. Carney's geography course. The tour commenced on July 2, 1972, and ended 37 days later on August 8, 1972. The countries toured were England, France, Netherlands, Belgium, Switzerland, Austria, Italy, and Germany. All of these countries, with the exception of Switzerland and Austria, were members of NATO. Other tours sponsored by NEA followed the same itinerary but only the tour taken by the petitioners offered members the option of receiving academic credit. The itinerary was that of a standard European sight-seeing tour. For example, in London, Florence, Rome, and Paris, the scheduled activities, among others, were the following: * * * LONDON. Morning arrival on 3rd day. You will enjoy one and a half days of sight-seeing while in London, sights to include Piccadilly Circus, St. James Palace, Regent and Oxford Streets, Marble Arch, Hyde Park, Westminster Abbey, Buckingham Palace, Parliament, Tower of London, and Cathedral of St. Paul. Excursion to Runnymede, the site of the signing of the Magna Carta *450 in 1215. You will also see Windsor Castle and Hampton Court. * * *
FLORENCE. Half-day sight-seeing will include the Medici Chapels (with famous tombs and statues by Michelangelo), St. Lawrence Church and bronze door Baptistry, Giotto's Belfry, Ponte Vecchio, and the Uffizi Art Gallery, one of the finest. * * *
ROME. One full day of sight-seeing, with the remainder of the time at leisure for individual choice of activity. Sightseeing will include: Fountain of Moses, Quirinal Palace, St. Peter-in-Chains Church (statue of Moses by Michelangelo), the Colosseum, the Temple of Venus, Arch of Constantine, the Pyramid of Caius Cestius, the Basilica of St. Paul-Outside-the-Walls, the temples of Vesta and Fortuna Virilis, the Roman Forum, Tabularium, Temple of Saturn, Palatine Hill, Forum of Julius Caesar, Borghese Park, Pincio Terrace, Trevi Fountain, Piazza del Popolo, Castle San Angelo, St. Peter's Square, Vatican Palace, plus others. * * *
PARIS. One day of sight-seeing and one day of leisure. Sightseeing includes: Rue de la Paix, Place Vendome, the Madeleine, Place de la Concorde, Champs Elysees, Arc de Triomphe, Tomb of the Unknown Soldier, Eiffel Tower, Bois *451 de Boulogne, and Napoleon's Tomb, plus other highlights. The petitioners followed the NEA itinerary but supplemented it by taking several side trips into the countryside whenever there was an opportunity. They took approximately 400 slides during the course of the tour. However, Mr. Carney visited no military installations, nor did he meet with NATO camouflage personnel. The total cost of the European tour was $2,916.36, half of which was allocable to each petitioner. Mr. Carney was not reimbursed for his allocable portion of the expense, nor did he seek reimbursement from MERDC. Both of Mr. Carney's supervisors at MERDC during his tenure there knew of no instance in which the Government had reimbursed an employee for expenses of this nature, and they would not have approved a request by Mr. Carney for such reimbursement. Upon returning from Europe, Mr. Carney worked 1 day at MERDC and then moved to Rolla, Mo., where he attended the University of Missouri for approximately 1 year. He successfully completed his course of study at the University of Missouri by August 1973, received a master of science degree in engineering management, and then returned to MERDC. Shortly *452 thereafter, Mr. Carney was promoted to senior technical representative to the NATO Joint Field Trial on Camouflage. In this capacity, he made several trips to Europe from 1973 to 1975, and on some of these trips, he took selected slides of his European tour with him. On their joint Federal income tax return for 1972, the petitioners deducted the entire cost of the European tour as an employee business expense. The petitioners substantiated to the Commissioner's satisfaction that they did in fact incur these expenses. However, in his notice of deficiency, the Commissioner disallowed one-half of the claimed deduction, the half allocable to Mr. Carney, on the ground that the tour did not directly relate to his employment and that a major portion of Mr. Carney's activities while touring Europe did not maintain or improve his skills in his employment. OPINION The basic issue for decision is whether the cost of a European tour allocable to Mr. Carney qualifies as a deductible educational expense under section 162(a). In view of our resolution of this issue, we do not reach the Commissioner's alternate position that even if these expenses otherwise qualify as deductible educational *453 expenses, they are nonetheless nondeductible because Mr. Carney relinquished his right to reimbursement for these expenses. Section 162(a) allows a taxpayer to deduct all the ordinary and necessary expenses of carrying on his trade or business, and such expenses may include the expenses of educational travel. Gino v. Commissioner,60 T.C. 304 (1973), revd. per curiam on other grounds 538 F. 2d 833 (9th Cir. 1976), cert. denied 429 U.S. 979 (1976); Marlin v. Commissioner,54 T.C. 560 (1970). Section 1.162-5(d), Income Tax Regs., provides: (d) Travel as a form of education. Subject to the provisions of paragraph (b) and (e) of this section, expenditures for travel (including travel while on sabbatical leave) as a form of education are deductible only to the extent such expenditures are attributable to a period of travel that is directly related to the duties of the individual in his employment or other trade or business. For this purpose, a period of travel shall be considered directly related to the duties of an individual in his employment or other trade or business only if the major portion of the activities during *454 such period is of a nature which directly maintains or improves skills required by the individual in such employment or other trade or business. The approval of a travel program by an employer or the fact that travel is accepted by an employer in the fulfillment of its requirements for retention of rate of compensation, status or employment, is not determinative that the required relationship exists between the travel involved and the duties of the individual in his particular position. Thus, if the petitioners are to prevail, they have the burden of proving that the skills required of Mr. Carney in his employment at MERDC were directly maintained or improved by a major portion of his activities while traveling. Gino v. Commissioner,60 T.C. at 309; Marlin v. Commissioner,supra; see Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). They attempt to meet that burden by demonstrating that Mr. Carney's duties at MERDC required him to have a knowledge of European geography and that a major portion of his European tour directly maintained or improved his knowledge of European *455 geography. The starting point in the analysis is establishing whether certain skills required by Mr. Carney in his employment were directly maintained or improved by his European tour. Gino v. Commissioner,60 T.C. at 310; Marlin v. Commissioner,54 T.C. at 566. The petitioners would have us focus on European geography as the only skill involved in Mr. Carney's work and then determine whether they have established the necessary connection between that skill and the European tour. However, for the purpose of demonstrating the requisite relationship, the proper approach is to analyze Mr. Carney's overall duties at MERDC, to examine the myriad diversified skills required of Mr. Carney in the performance of such duties, and then to determine whether these overall skills were directly maintained or improved by the travel. Gino v. Commissioner,supra at 310; Marlin v. Commissioner,supra.
In our opinion, the petitioners have failed to prove the necessary connection between the European tour and the general skills required of Mr. Carney in the performance of his overall duty as a camouflage engineer. To be sure, *456 a skill in European geography was helpful in connection with a portion of Mr. Carney's NATO work. However, the petitioners have not demonstrated that that portion of Mr. Carney's work was particularly important in terms of his overall duties at MERDC, or that that skill was especially significant in terms of his general skills as a camouflage engineer. Mr. Carney spent only approximately 50 percent of his time working on NATO projects during 1971 and 1972. These projects demanded that Mr. Carney have a broad knowledge of management, the engineering sciences, physics, optics, colorimetry, acoustics, and fields related to modern camouflage techniques, countersurveillance, and sensor technology. In addition to these skills, a knowledge of European geography was helpful but only when a NATO project dealt with camouflage and only when the specific camouflage technique involved was blending. From the description of the various projects, it is evident that they dealt with a number of defense matters other than camouflage. Moreover, even when they were dealing with camouflage, it is evident that all of the camouflage techniques were stressed. Finally, since Mr. Carney was employed *457 as a civil engineer, we wonder whether he was more involved with the technical, scientific, and research aspects of these projects than with the geographical aspects. Thus, it is readily apparent that European geography was only marginally or incidentally important as a skill necessary to the performance of his overall duties at MERDC, and the expenses of traveling to improve a skill of such limited significance in his work are not deductible. Gino v. Commissioner,60 T.C. at 310; Marlin v. Commissioner,54 T.C. at 566. Moreover, the petitioners have not carried their burden of convincing this Court that a major portion of Mr. Carney's activities during the tour directly maintained or improved any skill involved in his work. The NEA itinerary followed by the petitioners establishes convincingly that this trip was a general sight-seeing European tour and clearly demonstrates that Mr. Carney's activities were not materially "different from those reasonably expected of any other tourist * * * on a sight-seeing trip abroad." Dennehy v. Commissioner,309 F. 2d 149, 150 (6th Cir. 1962), affg. a Memorandum Opinion of this Court. Furthermore, *458 it seems that if Mr. Carney's major objective in taking the trip was t improve his skill as a camouflage engineer, he would have visited at least some military installations or set up a few meetings with NATO camouflage personnel rather than using his free time to take general sight-seeing side trips into the countryside. The petitioners attempt to distinguish this tour from other sight-seeing tours on the ground that it was conducted in conjunction with a geography course. However, two other sight-seeing European tours sponsored by NEA and not affiliated with a university followed an itinerary which was identical to that of the petitioners' tour. In addition, Mr. Carney did not register in any of the geography courses, he did not fulfill the course requirements such as writing a final term paper, and as a consequence, he did not receive any academic credit. Furthermore, the petitioners have not persuaded this Court that the nature of the tour as a general sight-seeing tour was altered in any material way by his testimony that 70 so-called lectures were given during the course of the tour. Since the professor conducting the geography course also served as the tour director, *459 we wonder how many of these "Formal class [lectures] and group [discussions]" and "Traveling [lectures] with class handouts" were given by the professor in his capacity as a geography teacher and how many were given in his capacity as a tour director. Similarly, we wonder how many of the "Traveling [lectures] by tour guide/guest speaker" were anything other than guided tours. The petitioners had every opportunity to satisfy our curiosity about the content of these "lectures." Mr. Carney testified that both he and his wife had taken handwritten notes during these lectures. Their failure to produce these notes at the trial precludes us from resolving the ambiguity in their favor. In conclusion, all of the objective evidence relied upon by the petitioners as supportive of their argument that a major portion of Mr. Carney's activities directly maintained or improved his skills in his employment is equally supportive of the Commissioner's theory that the petitioners simply went on a European sight-seeing tour. Under these circumstances, the petitioners are not entitled to deduct the cost of the European tour allocable to Mr. Carney. Decision will be entered for the respondent *460 . Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect for the year in issue.↩