JOSEPH J. IMHOFF and EDITH M. IMHOFF, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Imhoff v. Commissioner
Docket No. 441-77.
United States Tax Court
T.C. Memo 1980-30; 1980 Tax Ct. Memo LEXIS 555; 39 T.C.M. (CCH) 978; T.C.M. (RIA) 80030; January 31, 1980, Filed Joseph J. Imhoff, pro se. Russell K. Stewart, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, *556 Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1973 in the amount of $8,978. The issue for decision is the amount of the deduction to which petitioners are entitled for (a) expenses for the production and conservation of income, (b) legal expenses, (c) investment expenses, (d) travel expenses other than by automobile, (e) purchase of books and publications, (f) entertainment, and (g) payments made to organizations. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided at Merion Station, Pennsylvania, at the time of the filing of their petition in this case, filed a joint Federal income tax return for the calendar year 1973 with the District Director of Internal Revenue, Philadelphia, Pennsylvania. Joseph J. Imhoff is a retired Army Colonel. He and Mrs. Imhoff during the years *557 here in issue and for a number of years prior thereto resided in a large home on over three acres of ground at Merion Station, Pennsylvania. During the year here in issue and for a number of years prior thereto, petitioners have owned commercial real estate located in Washington, D.C. and Arlington County, Virginia. The day-to-day management of this property was handled for them by H. G. Smithy Co., Washington, D.C. However, petitioners consulted with representatives of H. G. Smithy Co. about the management of the property and made the final decisions themselves on most items respecting the leasing of space and major repairs or renovations on their property. During 1973 petitioners also owned a commercial property in Philadelphia, Pennsylvania. Petitioners owned an extensive portfolio of stocks and bonds from which they received dividend and interest income. During the year 1973 they made sales of stock in 15 different companies. Included in the stock sold were shares of Toyota Motors, Ltd., Japan Airlines, and Tubos de Acero de Mexico. Petitioners also had capital gains distributions from 9 other stocks. In managing their stocks and bonds it was necessary for petitioners *558 to consult with brokers, to take stock certificates to and from their safe deposit boxes and to enter their safe deposit boxes to clip coupons. Petitioners received $30,783 in dividends in 1973 and $31,099 in interest. Petitioners had no office space outside their home. Petitioners' home consisted of 15 rooms and 2 other areas which though not enclosed were room size, 6 bathrooms, a furnace room, a room for the water heater, a loft, 2 large hallways on the first floor and second floor hallways. On the ground floor, in addition to the furnace room, water heater room and laundry room, was a large room and a smaller room. On the first floor was a 22 X 44 foot living room, a large room which had at one time been used as the family dining room, a 16 X 14 foot room which had at one time been used as a breakfast room but which was used by petitioners as their dining room, a large kitchen, another large room which had bookshelves and had been used as a library, and a smaller first floor room toward the front of the house. The second floor contained the master bedroom suite which had a separate dressing room-study, two other bedrooms and another suite which consisted of a bedroom and *559 attached dressing room. Each of these four rooms on the second floor had a bath. There was another room on the second floor, a large open space, a number of storage rooms and a number of closets. One of the six baths was on the ground floor next to the laundry room and one on the first floor next to the small room toward the front of the house. The hallways were furnished primarily with cabinets in which petitioners kept a collection of Worcester ceramics and other porcelains, including Boehm birds. On the large stairway landing was an ornamental cabinet in which petitioners kept papers. There were also chairs in the hallways. In the large ground floor room Col. Imhoff had a desk. In that room there were also two tables. Mrs. Imhoff at times used one of the tables to work on the preparation of income tax returns. There were also two typewriters in the large ground floor room. In the smaller ground floor room there was a table and an adding machine. The smaller room toward the front of the house on the third floor was used by Mrs. Imhoff as an office. She had a desk and files in that room. The room on the first floor that had bookshelves and had at one time been used *560 as a library was used by Col. Imhoff during 1973 for reading. There was a telephone and television in that room. In the room on the first floor that had at one time been used for a dining room was a ig table. Col. Imhoff had materials with respect to his income tax stacked on this table and in other parts of the room. That room was used in 1973 by petitioners as a room in which to keep income tax material and for Col. Imhoff to work on income tax matters. Mrs. Imhoff did not use this room. On the second floor there was a room which Col. Imhoff considered as his regular office. He had file cabinets and files in that room, a telephone and table where he kept stationery and supplies and a typewriter. There was also a television in this room. In addition, there was an open space on the second floor larger than an average room where petitioners had two tables that sometimes were used by Mrs. Imhoff. One of the storage rooms on the second floor was used for storage of files. There were two telephones and a television in the master bedroom and a small television in the kitchen. However, generally when petitioners would watch television it would be in the downstairs room that had *561 been a library. Generally when a broker or someone came to the house to discuss a sale or purchase of stock or other matters with petitioners the first floor room used by Mrs. Imhoff as an office would be the place in which the discussion would take place, but occasionally such matters would be discussed in petitioners' living room. During 1973 petitioners spent $756 on books and publications. Included in these expenditures were the following items: America's Future
$25
American Historical Association
2
American Opinion
30
Arts of Asia
9
Brooklyn Botanical Plants and Garden
7
Christian Crusade Weekly
15
Gourmet
13
Independent American
50
Manion Forum Reports
50
McCall's
6
National Geographic
8
National Observer
3
Newsweek
10
Kanzinger Home News Service
94
Phyllis Schafley
10
Reader's Digest
14
Review of the News
10
Salvation Army
8
Staturday Evening Post
8
Yankee Magazine
4
Worcester Porcelain books
48
Superintendent of Documents Military Book
5
Public Broadcasting Service
50
National Geographic Society Book
8
Books purchased at various book fairs
99 [2]
*562 In 1973 petitioners paid a fee for tax assistance in the Commonwealth of Virginia of $208.65, a fee for filing a petition with this Court of $10, and $18 for photocopying and mailing documents to this Court and to respondent. [3]
During 1973 petitioners paid $662 to various organizations. Included in these amounts were payments to the following: University Club of Washington
$78
Retired Officers' Association
4
Merion Garden Club
56
Committee for Conservative Action
5
East African Wild Life Society
10
English Ceramics Study Group
30
Purdue Alumni
50
Committee on Pan American Policy
25
Bala Cynwyd Narberth Rotary
82
Institute for American Strategy
25
Geographical Society of Philadelphia
45
Firearms Lobby
15
American Security Council
40
Sigma Delta Chi
13
Council Against Communist Aggression
15
League of Republican Women
5
Women's Club of Bala Cynwyd
17
Women's Board of Lankenau Hospital
16
Volunteer Medical Service Corp.
5
Union Fire Association
10
National Right to Work Council
25
Freedom's Foundation
10
Botanical Society of Merion
25
New Jersey Professional Engineers
5
Americans for National Security
25
*563 The Volunteer Medical Service Corp. was a volunteer rescue squad in the Merion area and the Union Fire Assn. was a volunteer fire organization. [4]
During 1973 petitioners expended the following amounts with respect to investments: RHM Warrant and Stock Survey
$ 95.00
Wall Street Transcript
125.00
Charge for a foreign certificate
5.00
Publication by New York Stock Exchange
7.50
Indicator Digest
78.00
International Investment Advisor
36.00
Three safe deposit boxes
42.00
Investment Seminar
50.00
Institute for International Research
252.00
Value Line Investment Service and
Standard and Poor's International
Stock Reports
445.00
Photocopying and mailing
23.00 [5]
In addition to the above amounts petitioners spent (1) $60 for a large safe deposit box in Philadelphia and $24 for a box in Bala Cynwyd in which they kept stocks and bonds, *564 and (2) $100 in establishing a petty cash fund for expenses involved for civil litigation instituted by petitioners and others as shareholders against the Provident Fund for Income for fraud that the shareholders claim was perpetrated against them by directors of the Provident Fund for Income. On January 8 and 26, February 8, 16, 19, 23 and 26, March 7, 9, 12, 14 and 30, April 16, May 1 and 27, June 27, July 24 and 27, August 3, 15, 16, 20, 22, 27, 28 and 30, September 5, 25 and 26, October 1, 9 and 24, and November 6 and 19, Col. Imhoff made trips by public transportation from his home to Philadelphia, Pennsylvania. On 14 of these 34 trips, Col. Imhoff traveled to Philadelphia so that he could place in or remove securities from petitioners' safe deposit box at the First Pennsylvania Bank. On 10 of these occasions Col. Imhoff traveled to Philadelphia for conferences concerning Federal tax litigation or concerning his Federal income tax liability for 1971. Expenditures made by Col. Imhoff for cab fares and lunches relating to these trips totaled $29. On 8 of the occasions that Col. Imhoff traveled to Philadelphia in connection with Federal tax litigation or concerning his Federal *565 income tax liability for 1971, he departed from Philadelphia for either Wilmington, Delaware or Washington, D.C. Litigation was taking place in Wilmington, Delaware involving Imperial Jade, a partnership in which petitioners had invested. Petitioners were attempting to recover assets they claimed were fraudulently taken by other parties. Petitioners expended the sum of $183 in 1973 for travel involving litigation for Imperial Jade.On one occasion during 1973 Col. Imhoff traveled to Washington, D.C. in connection with petitioners' commercial property in the Washington, D.C. area at a cost of $33. [6]
On March 14, 1973, petitioners hosted a party for their English Ceramic Study Group at their residence. The curator of the Royal Worcester *566 Porcelain Company Museum of England was the guest speaker and approximately 40 guests were present. On April 21 and 22 petitioners spent $30 for Easter baskets and gifts for their employees. On June 18 they spent $19 for tickets to the Theater Guild which were given to Naomi Dept. On October 26 petitioners purchased pecans for $43 which were given to the St. John's Convent, P.C. Ayres, Jean Koons and Frank Fisher. On December 20, 1973, petitioners purchased Christmas gifts from John Wanamakers which were given to M.M. Nicholson ($13), M.H. Groves ($11.50) and Frank Fisher ($19.50). On December 28, 1973, petitioners paid caterer Posey Roher $30 to cater a party at their residence. On six occasions during 1973 petitioners hosted at their home a meeting for dissatisfied shareholders of the Provident Fund for Income. On January 2, 1973, petitioners hosted a conference to discuss the Imperial Jade matter and also during 1973 hosted a dinner conference for a retiring friend and provided some refreshments for the friend's retirement party. Petitioners in 1973 attended three conferences in Philadelphia concerning the Provident Fund for Income. In 1973 petitioners gave liquor purchased *567 for $25 to John Devine and liquor purchased for $12 to Thomas J. Owens. During 1973 petitioners employed Naomi Dept. Mrs. Dept lived in petitioners' home in the suite consisting of a room, dressing room and bath on the second floor. She was a housekeeper for petitioners. She did the cleaning, some of the cooking, answered the telephone and door and if petitioners were not available took the message. Mrs. Dept also acted as a chauffeur for Mrs. Imhoff. She would drive Mrs. Imhoff to the bank when Mrs. Imhoff had business to transact or to other business appointments and would also drive Mrs. Imhoff to such places as the grocery store and to various meetings. Petitioners furnished Mrs. Dept with the suite on the second floor, all of her meals, and paid her a cash salary of $3,900 in 1973. Petitioners also gave Mrs. Dept a $50 chapel gift and certain other presents during the year 1973. Petitioners employed Eullia Whiting as a laundress during the year 1973. Her wages were $455. Petitioners employed Walter Whiting as a house handyman to do the heavy cleaning and paid him wages during 1973 of $230. During 1973 petitioners expended for provisions $4,242.68. These expenditures *568 consisted primarily of payments for food consumed in petitioners' household. However, it also included various household items purchased at grocery stores such as household supplies for cleaning. During 1973 petitioners expended for other household items, such as trash bags, paper napkins, drycleaning, paper towels and minor repairs, a total of $693.37. During 1973 petitioners expended for utilities a total of $3,275.09. Petitioners purchased candies and nuts during 1973 for a total amount of $267.49. During 1973 petitioners made department store expenditures for various items used either by them in connection with their investment activities or in their household totaling $2,790.15. Included in this amount were such items as silver plates, 12 Christmas plates, chinaware, silver plate pan, plants and garden supplies and various household items. Also included in these department store expenditures were the following: Date of
Department
Purchase
Store
Item
Amount
Jan. 3
Gimbels
Office supplies
$11.13
Jan. 19
Wanamakers
Stationery
23.00
Feb. 23
Wanamakers
Stationery
14.74
July 23
Lord & Taylors
Stationery
14.84
During 1973 petitioners *569 expended in connection with upkeep on their house and grounds $4,195.42. This expenditure was primarily for labor in maintaining the grounds of petitioners' house, various supplies for the garden and lawn, and garden tools and plants. However, it also included such items as plumbing repairs in the house and painting of the house. During 1973 petitioners made miscellaneous expenditures in connection with their home and their investment transactions of $3,883.92. These expenditures included social security tax paid for Naomi Dept of $67.60 on January 16, 1973, $93.26 on April 19, 1973, $93.26 on July 18, 1973, and $93.26 on October 25, 1973. It also included the following amounts of United States postage paid on the dates indicated: Janpary 2
Postage
$ 3.57
February 5
Certified mail (H.G. Smithy)
1.35
February 12
Stamps and stamped envelopes
5.00
February 20
Certified mail (H.G. Smithy)
1.00
March5
Stamps
7.80
Registered mail
1.78
April 19
Certified mail (Va. tax return)
1.00
May 3
Registered letter
1.18
May 30
Stamps
14.00
Certified mail (H.G. Smithy)
1.78
June 4
Registered mail (H.G. Smithy)
2.00
June 13
Certified mail
1.00
June 30
Registered letter (I.R.S.)
1.84
July 2
Certified letters (2)
2.00
July 12
Rent - P.O. Box
10.80
July 27
Photostat of telegram to IRS
2.00
September 4
Certified mail (I.R.S.; H.G. Smithy)
4.00
October 15
Certified mail
1.00
*570 Also included were such items as luncheons for Mrs. Dept and expenditures at white elephant sales. Other expenditures included were payments for public liability insurance of $414, homeowners insurance of $859, general liability insurance of $285 and such items as flowers, insurance on silver, and photocopying. Depreciation applicable to petitioners' entire house for the year 1973 was $2,552. Petitioners on their Federal income tax return for the calendar year 1973 claimed under "Miscellaneous Deductions" a total amount of $18,214 composed of the following: Autos (2)
$ 1,426
Books & Publications
911
Entertainment (Business)
475
Production and Conservation of Income
12,500
Investment
1,387
Legal
400
Organizations
665
Travel (other than auto)
450
Respondent in his notice of deficiency disallowed the claimed miscellaneous deductions in full on the ground that petitioners had failed to substantiate any amount of the claimed deductions. OPINION Petitioners' contention is that they are entitled to all the deductions claimed by them either as business expense deductions under section 162, I.R.C. 1954, [7] or deductions *571 for the production of income or conservation of income-producing property under section 212. It is respondent's position that petitioners were not in any business and that any deductions to which they are entitled would necessarily be deductions under section 212 relating to expenditures for the production of income. There is insufficient information in this record to determine whether petitioners' ownership and the part of the management they did on two commercial properties in the Washington, D.C. area and the one commercial property in Philadelphia were sufficient to constitute a business. However, in the ultimate determination of this case this lack of evidence is unimportant since clearly the commercial properties were held by petitioners for the production of income and petitioners' activities with respect to their stocks and bonds were activities for the production of income. For this reason, petitioners are entitled to deduct the amounts they can show are ordinary and necessary expenses proximately related to the production of *572 income from the commercial real estate they owned or from their stocks and bonds. Bingham's Trust v. Commissioner,325 U.S. 365 (1945). The income from investments includes rental, dividends, interest and receipts from sales. It is therefore necessary for us to determine to what extent petitioners have substantiated their claimed deductions and what amount of these claimed deductions are ordinary and necessary expenses proximately related to their income-producing activities. [8]
Petitioners have failed to show that they paid any legal expenses in the year 1973 other than the $236.65 conceded by respondent to be deductible. As previously stated in a footnote, respondent has now conceded the deductibility of the entire $1,426 claimed as automobile expenses. Of the claimed deductions of $1,387 of investment expenses, petitioners have established that they expended the amount of $1,342.50 and respondent has conceded the deductibility of $1,158.50 of this *573 amount. Of the $184 that petitioners have shown to have been expended as investment expenses which respondent has not conceded, we hold that the amount of $84 paid for the two additional safe deposit boxes is deductible. The evidence shows that stocks and bonds were kept in these boxes. Respondent's position seems to be that three safe deposit boxes were enough for petitioners. However, Col. Imhoff testified that petitioners had numerous stock certificates and bonds. In our view, the extra two safe deposit boxes were not excessive. We accept Col. Imhoff's testimony that these two additional safe deposit boxes contained income producing stocks and bonds and hold the $84 rental fee to be deductible. The record is too sketchy with respect to the $100 contributed by petitioners to a petty cash fund in connection with litigation instituted by stockholders against the Provident Fund for Income to show the reason for the payment. Therefore, petitioners have not carried their burden of proof to show this item deductible. With respect to travel expenses, other than automobile, of $450, respondent has conceded that $65 is deductible. Petitioners have either not substantiated the remainder *574 of this amount or have failed to show the connection of the amount with any activity geared toward the production of income. There is insufficient evidence to show whether the trips Col. Inhoff made to Wilmington in connection with certain suits were items which are deductible. See Dyer v. Commissioner, 36 T.C. 456, 464-465 (1961). Because of petitioners' failure of proof, we hold none of the amount claimed as travel, other than auto, except the $65 conceded by respondent, to be deductible. Of their claimed deduction of $911 for books and publications, petitioners have substantiated the expenditure of the amount of $756. Respondent has conceded that $171 of this amount is deductible. In our view, petitioners have failed to show that any of the publications which respondent has not conceded to be deductible are sufficiently related to the production of income or the conservation of property held for the production of income to be properly deductible. Petitioners' position is that anything they learned from any of these publications might in some way aid them in connection with their income-producing activities. Col. Imhoff, for instance, testified that they had *575 investments throughout the world and therefore any magazine dealing with activities anywhere in the world assisted them in their production of income. Col. Imhoff testified that they were very interested in porcelain and collected it and therefore the cost of a magazine with respect to porcelain should be deductible by them since at some time they might decide to sell some of their porcelain. In our view, this testimony does not show that any of these magazines were sufficiently connected with petitioners' production of income activities to be deductible. Petitioners deducted $475 for business entertainment. The record totally fails to show sufficient connection of any of the expenditures for entertainment included in the claimed deduction to petitioners' income-producing activities to permit their deductibility. Petitioners contend that $300 of the amount claimed as an entertainment expense deduction was in connection with a party given for petitioners' English Ceramics Study Group. As heretofore stated, petitioners have failed to show either a business connection with ceramics or that their activities with respect to ceramics were activities with respect to property held for *576 the production of income. Other items claimed dealt with meetings petitioners hosted for dissatisfied shareholders for the Provident Fund for Income and partners of Imperial Jade. Petitioners have failed to show by sufficient evidence that these items were connected with the production of income. We therefore hold that petitioners have failed to carry their burden of proof with respect to the deductibility of these items. Also, petitioners have not shown in sufficient detail the amount of these expenditures or who was present and what was discussed at the meetings. The items consisting of gifts and flowers included in the claimed entertainment expenses have not been shown to have been given to persons with whom petitioners had any business connection or to be sufficiently related to petitioners' production of income activities to be deductible. The Easter baskets and gifts given to employees and the theater tickets given to Naomi Dept would only be deductible to the extent that the employees, including Naomi Dept, were shown to be business as distinguished from personal employees. This issue is discussed hereinafter. Petitioners claimed a deduction for organization expenditures *577 in the total amount of $665. They have substantiated expenditures of $662. Of this amount, respondent allowed only $26. Included in the items not allowed by respondent which were substantiated were $5 paid to the New Jersey Professional Engineers and $4 paid to the Retired Officers' Association. Col. Imhoff testified that as a retired officer he would be subject to recall in case of emergency. He received substantial retired military pay income. Though not completely clear in the record, Col. Imhoff is also apparently a professional engineer, which activity is connected with his military career. Although Col. Imhoff is not now on active duty in the military, he is engaged in the business of being a military officer since he is subject to recall to active duty. Under the facts here shown, these two items are sufficiently related to Col. Imhoff's professional military career to be proper business expense deductions. Two other items which petitioners claimed as organization deductions were $5 paid to the Volunteer Medical Service Corporation and $10 paid to the Union Fire Association. Respondent does not deny that these amounts would be proper charitable deductions, but points *578 out that petitioners did claim on their tax return substantial amounts as charitable deductions and that no portion of this claimed deduction was disallowed in the notice of deficiency. Col. Imhoff in effect testified that these amounts were not included in the claimed charitable deductions. The evidence is sketchy. However, considering the record as a whole, we hold that these two items are properly deductible as miscellaneous deductions. One other item that would appear to be deductible is the $16 payment to the Women's Board of Lankenau Hospital. However, there is no evidence in the record with respect to this item. Because of this failure of proof, this item and all other items claimed by petitioners as organization expense deductions, which respondent has not conceded or we have not held to be deductible, we hold not to be deductible. The major argument in this case deals with petitioners' claim for a deduction of $12,500 as production and conservation of income expenses. Col. Imhoff's explanation of how he arrived at this deduction was that he took 47.06 percent of the items listed as provisions, household items, utilities, candy and nuts, department store expenses, *579 house and grounds expenses and miscellaneous unclassified expenses, plus the salaries of Mrs. Dept. Mrs. Whiting and Mr. Whiting, and depreciation and arrived at approximately the $12,500, which was rounded off. The total of the expenses to which petitioners applied the 47.06 percent, other than the salary and depreciation expenses, is $19,348.12. When the depreciation and salaries are added to that figure, the total is $26,485.12, and 47.06 percent of $26,485.12 is approximately $12,500. The difficulty with petitioners' position is that they have not shown that they are entitled to deduct as expenses for production of income or conservation of income-producing property any portion of most of the various items to which they applied the 47.06 percent or that 47.06 percent is a proper percentage to apply to the few items that are partially related to their production of income activities. Col. Imhoff testified that he arrived at the 47.06 percent by considering that seven rooms in petitioners' house were used for business and eight rooms for personal reasons, and that therefore 7/15ths of all household expenditures, including provisions, garden supplies and employees' salaries, were *580 properly deductible. [9] Respondent argued that the only items which should be included in any allocation of expenses to office space used by petitioners for the production of income are the $3,275.09 of utility bills and the $2,552 of depreciation. [10] Respondent particularly points to such items as drycleaning, flowers and dog licenses which petitioners included in the expenses they allocated partly to business. Respondent argues that petitioners have totally failed to show the allocable portion of the house used for the purposes of production of income, but on brief concedes that 5.78 percent of the house was used for production of income purposes. [11]
*581 In the recent case of Browne v. Commissioner,73 T.C. No. 56 (filed January 22, 1980), we discussed the method of computing a home office expense deduction for an individual who used a portion of her apartment in her trade or business. We see no reason why any different method should be used in determining the proper deduction by an individual who uses a portion of his home in connection with activities for production of income. as was pointed out in Bingham's Trust v. Commissioner,supra at 373, "section 23(a)(2) [the predecessor of section 212] is comparable and in pari materia with section 23(a)(1) [the predecessor of section 162], authorizing the deduction of business or trade expenses." In the Bingham's Trust case the Court pointed out that, as in the case of business expenses, if the expense is ordinary and necessary it need not relate directly to the production of income if it is "directly connected with or proximately results from the conduct of the business." The Court then stated (at 374): The effect of section 23(a)(2) was to provide for a class of nonbusiness deductions coextensive with the business deductions allowed *582 by section 23(a)(1), except for the fact that, since they were not incurred in connection with a business, the section made it necessary that they be incurred for the production of income or in the management or conservation of property held for the production of income. McDonald v. Commissioner,supra, 61-62, 66; and see H. Rep. No. 2333, 77th Cong., 2d Sess., pp. 46, 74-76; S. Rep. No. 1631, 77th Cong., 2d Sess., pp. 87-88. In our view the same criteria should be used for determining the amount of a deduction to which a taxpayer is entitled for a home office used by him in connection with the production of income as is used to determine the deduction where a taxpayer's house is partially used in his trade or business. In Browne v. Commissioner, supra, we pointed out that a taxpayer must prove not only what part of the residence was used for business purposes but also the portion of the time it was so used. We then discussed respondent's contention that the allocation should properly be made by comparing the time of business use of the premises with the total *583 time the premises were available for both business and personal use. Under such a method, it is obvious that any allocation of part of the costs of maintaining petitioners' house to income-producing activities would be very very small. However, we rejected respondent's method of allocation even though recognizing that the Court of Appeals in Gino v. Commissioner,538 F.2d 833 (9th Cir. 1976), in reversing 60 T.C. 304 (1973) in this respect had used such a system of allocation. We concluded that the appropriate method of determining the allocation between business and non-business use of premises should be the allocation used by this Court in Gino v. Commissioner,supra.In the Gino case, the allocation was made by obtaining the ratio which results from the total hours the premises are used for business divided by the time the space was actually used for all purposes. The problem in the instant case is that we lack information in this record to make the proper determination. Col. Imhoff testified that seven rooms were used exclusively in activities related to the production of income. He testified that in the library on *584 the first floor he did reading and he and Mrs. Imhoff watched television. It was his view that any information he obtained helped him in his production of income activity and therefore almost everything he did was a production of income activity. It was also his view that because papers were stacked on the table in the room that had previously been used as a dining room, this room was used exclusively for production of income purposes. Also, Col. Imhoff refused to determine on a square footage basis the space in the house which he considered to be used for the production of income as compared to the total space in the house. He stated that he made his determination on a different basis. It is obvious from the facts we have found that even the seven rooms which Col. Imhoff testified were used exclusively for production of income purposes did not constitute a percentage approaching 47 percent of the total square footage of the house. However, there is nothing in this record to assist us in determining what percentage of the floor space they did constitute. It was Col. Imhoff's view that a room is a room regardless of its size and that hallways, utility rooms and closets and comparable *585 spaces should not count as space. Therefore, petitioners have totally failed to prove even the percentage of the square footage in their home which they contend was used for the purpose of production of income. It is also clear from this record that there was no "production of income" reason for using seven rooms in petitioners' home to spared out papers that occasionally were worked on. Also, it is clear that not all of Col. Imhoff's reading was proximately related to his production of income activities. Insofar as this record shows, none of his watching of television was proximately related to his production of income activities. The house was large and obviously two people with one housekeeper and a little extra part-time help not only did not need all that space but could not conveniently even use it for personal living space. The fact that a taxpayer who has extra space chooses to stack some income tax papers or investment-related papers in extra space in his home because it is convenient for him to do so does not cause that space to be directly or proximately connected with his production of income or to be an ordinary and necessary expense. See Sharon v. Commissioner,66 T.C. 515, 522-525 (1976). *586 On the basis of this record, we are totally unable to determine either the percentage of the total square footage of petitioners' residence which petitioners contend was used for income-producing purposes or the part it would be "necessary" in the statutory sense of ordinary and necessary expenses for petitioners to use for office space. There is no evidence giving a reasonable indication of the times such space was used for purposes of the production of income as compared to the time it was actually used for all purposes. Because of this total failure of proof on the part of petitioners, we accept respondent's concession and use the 5.78 percent as the appropriate percentage of the premises used for production of income purposes. As respondent points out, this percentage should be applied to the utility costs and depreciation. However, in our view this percentage should also be applied to homeowners insurance as distinguished from the various liability insurances carried by petitioners, since this space was protected by the homeowners insurance just as was the balance of the house. Also, in our view, this percentage should be applied to the wages paid to Mr. Whiting since the record *587 is reasonably clear that he did the heavy cleaning of the space used for production of income as well as the other parts of the house. However, we do not agree with petitioners that the salary and other payments made to Mrs. Dept should be allocated on any space percentage basis. Mrs. Dept not only did cleaning, she did cooking and ran errands and performed the other functions generally done by a housekeeper. The record does show that she did some business driving for Mrs. Imhoff. While petitioners are technically correct that the cost of Mrs. Dept's food should be added to her wages to determine her total compensation before allocation of some portion thereof to petitioners' production of income activities, this record is totally inadequate to show the amount of that cost. The social security taxes paid for Mrs. Dept are shown in the record and, in considering what portion of Mrs. Dept's wages might be properly considered to be an expense of petitioners' production of income, these amounts should be taken into consideration. In spite of the record, we have considered the time that Mrs. Dept might have spent in cleaning the spaces in the home used for the production of income, *588 the time she might have spent as a business chauffeur for Mrs. Imhoff in connection with Mrs. Imhoff's production of income activities, and any other functions she may have served related to petitioners' production of income. We have considered not only her salary but also that some amount should be allowed for the cost of her food and that social security taxes paid on her behalf should be added to her salary. Using our best judgment in this respect, under the principles of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930), we determine that the amount of $700 of Mrs. Dept's wages, including food costs and other items paid by petitioners on her behalf and social security taxes paid on her wages, is properly deductible by petitioners. The only activity which Mrs. Whiting performed in connection with the space used by petitioners for production of income shown by this record is the washing of curtains and slip covers. Again, on the basis of Cohan v. Commissioner,supra, we have estimated this amount at $40 for the year 1973. Petitioners have totally failed to show why any portion of the ground upkeep should be allocated to their production *589 of income activities. Insofar as this record shows, the only persons who came to the house in connection with such activities were some account executives. The record fails to show how often anyone came to petitioners' home in connection with income-producing activities. In our view, the upkeep of the 3-1/2 acres of ground was not proximately related to petitioners' production of income activities and no part of this expense is deductible. Col. Imhoff testified that all of the certified and registered letters he sent were in connection with the petitioners' property rental or stock or bond transactions. The other facts in this record indicate that this is in fact the situation. We hold that petitioners are entitled to deduct all costs of registered and certified mail paid in 1973. The record does not show an adequate basis for allocation of the other postage costs between personal and production of income activities. However, considering the testimony of the investment activities of petitioners we conclude that one-half of this amount is also properly deductible. The cost of stationery used for production of income activities has no relationship to the space in the home *590 used for production of income purposes. The record shows purchases of stationery but does not show the amounts of this stationery used for personal as compared to production of income purposes. Considering the testimony as to the amount of writing in connection with production of income activities which petitioners did, we have concluded that 50 percent of the stationery costs paid by petitioners in 1973 is properly deductible. We have considered the nature of all the other expenses claimed by petitioners to be partially deductible as amounts paid for the production of income and have concluded that this record is insufficient to show that any portion of these amounts is properly deductible. [12]
*591 Decision will be entered under Rule 155.
Footnotes
1. Initially, there was an issue with respect to the amount of deduction to which petitioners were entitled for automobile expenses, but on brief respondent conceded that petitioners were entitled to deduct the entire $1,426 claimed by them on their return for such expenses.↩
2. Also included in this $756 were amounts totaling $171 which petitioners spent for Barrons' Eagle Trust Fund, Financial World, Lasser's Tax Service, Dow Jones Publications tax book, Wall Street Journal, New York Times, Fortune, and three tax books. Respondent has conceded that these amounts are all properly deductible. The total amount is stipulated to be $756. However, the addition of the individual items stipulated total $757.↩
3. Respondent has conceded that these amounts are properly deductible.↩
4. Also included in the $662 was $10 paid to the Smithsonian Institute and $16 paid to the National Wildlife Federation. Respondent concedes that this $26 is deductible.↩
5. Respondent has conceded that these items, totaling $1,158.50, are properly deductible by petitioners as investment expenditures.↩
6. Of the amounts listed above, respondent concedes that $28 ($2 per trip) is deductible for the cost of the 14 trips Col.Imhoff made from his home to Philadelphia to place securities in or remove them from petitioners' safe deposit box; that $4 for the 2 trips to the Internal Revenue Service when Col. Imhoff did not proceed to either Wilmington or Washington is deductible; and that the $33 spent to go to Washington, D.C. is deductible.↩
7. All section references are to the Internal Revenue Code of 1954, as amended and in effect in the year in issue, unless otherwise stated.↩
8. Col. Imhoff refused to permit the Revenue agent to examine his books and records for 1973, which caused respondent to disallow all petitioners' claimed "Miscellaneous Deductions" for lack of substantiation.↩
9. Obviously, 7/15ths is 46.67 percent rather than 47.06 percent, but this difference was not explained by Col. Imhoff. ↩
10. Respondent recognizes that an allocable part of postage is also deductible. However, in our view this item and other items we will discuss hereinafter should be allocated between amounts for the production of income and personal amounts on the basis of the amount used for each purpose and not on the basis of the portion of petitioners' home used as office space. ↩
11. Respondent obtained this figure from two prior cases involving the same petitioners. Imhoff v. Commissioner,T.C.Memo. 1970-221, 29 TCM 966, 39 P-H Memo. T.C. par. 70,221, p. 1056 (1970), involving the years 1961, 1962 and 1963, and the case of Imhoff v. Commissioner,T.C.Memo. 1979-57, 38 TCM 230↩, 48 P-H Memo. T.C. par. 79,057, p. 231 (1979), involving the years 1971 and 1972.
12. Petitioners in their brief primarily argue that we should hold that there is no deficiency in their tax for 1973 since respondent did not properly comply ith an order entered by this Court on February 1, 1978, directing the parties to stipulate facts in accordance with Rule 91(f) of the Rules of Practice and Procedure of this Court. A motion to this effect was made by Col. Imhoff at the trial and denied. However, since petitioners' brief is devoted primarily to this argument, it is of little help to the Court in understanding the basis of petitioners' position with respect to the various items claimed by them to be deductible. Col. Imhoff was informed by the Court on several occasions during the course of the trial that it was incumbent upon petitioners to prove that they were entitled to the deductions claimed. Apparently this fact had been also brought to his attention at the trial of the case involving the years 1971 and 1972. See Imhoff v. Commissioner,T.C. Memo. 1979-57↩ (filed February 15, 1979).